# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN McGEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case number 4:06cv0990 HEA |
| | ) | TCM |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying Kathleen

McGee ("Plaintiff") disability insurance benefits ("DIB") under Title II of the Social Security

Act ("the Act"), 42 U.S.C. §§ 401-433, and supplemental security income benefits ("SSI")

under Title XVI of the Act, 42 U.S.C. §§ 1381-1383b.[2]  Plaintiff has filed a brief in support

of her complaint; the Commissioner has filed a brief in support of his answer.  The case was

referred to the undersigned United States Magistrate Judge for a review and recommended

disposition pursuant to 28 U.S.C. § 636(b).

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security on February 12, 2007, and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2]The Commissioner reports that the SSI application was not "available for inclusion in the record."  (Brief at 1.)  There is no allegation that this application contained different information or allegations than those in the DIB application.

## Procedural History

Plaintiff applied for DIB and SSI in March 2004, alleging she was disabled as of March 31, 2002, as a result of diabetes, hypertension, and vision problems. (R. at 47-49.)[3] Her applications were denied. (Id. at 22, 2-28.) Following an administrative hearing held in October 2005, the Administrative Law Judge ("ALJ"), James E. Seiler, concluded that Plaintiff was disabled as of September 21, 2005; however, her disability earnings requirement was satisfied only through June 2003. (Id. at 14-21.) Consequently, she was not entitled to DIB. (Id. at 20.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 3-5.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified that was 5 feet 9½ inches tall and weighed 149 pounds, 21 pounds less than she had weighed three years before. (Id. at 152.) She was born on August 2, 1949, and was then 56 years' old. (Id. at 153.) She lived alone. (Id.) She was separated from her husband, who had been in prison for the past 21 years for drugs. (Id.) She had three children, the youngest was 26. (Id.) She had finished high school. (Id. at 153-54.) She had started in special education classes, but had finished in regular classes. (Id. at 154.)

Asked about her current income, Plaintiff replied that she received approximately one hundred dollars a week from her church and food stamps. (Id.) Her church would give her

---

[3]References to "R." are to the administrative record filed by the Commissioner with his answer.

this money whether or not she played the piano for them.  (Id. at 168.)  The church had also paid her real estate taxes when she was about to lose her house for back taxes.  (Id.)  Her Medicaid had been terminated three months before; she had reapplied.  (Id. at 154.)

Plaintiff left her last job, caring in 2002 for a lady named Edna Lovings, because Ms. Lovings became "real sick" and because she did not like Plaintiff.  (Id. at 155.)  She said Plaintiff broke things and burned food.  (Id.)  When she worked for Alexander and Mattie Jenkins she cleaned their house and took care of them.  (Id.)  She had worked in 1998 as a security guard for St. Louis Ark.  (Id. at 155-56.)  She had also worked for Delmar Gardens North doing healthcare, for Wheeling Security doing security checks, for Avanti Petroleum as a cashier, for Buttons and Bows Preschool taking care of children, and for TPI Petroleum as an assembly line worker.  (Id. at 156-57.)  When she stopped working, she unsuccessfully applied for unemployment benefits.  (Id. at 164.)  She had also applied for other jobs, for instance, doing cleaning or working at a service station.  (Id. at 164-65.)

Plaintiff was currently being treated for diabetes and high blood pressure.  (Id. at 157.)  The diabetes was not under control; it made her tired and hungry.  (Id.)  Asked why she was then tearful, she replied that she did not know.  (Id.)  She sometimes had crying spells.  (Id.)  Asked if she had feelings of overwhelming or prolonged sadness, guilt, or hopelessness, she replied "yes" to each.  (Id.)  She did not feel worthless.  (Id. at 157-58.)

Plaintiff sometimes lacks the desire to participate in social activities and no longer skates or plays volleyball, badminton, or baseball.  (Id. at 158.)  She has to write everything down in order to remember things.  (Id.)

Additionally, Plaintiff's legs ache her if she stands for longer than two hours, she can sit comfortably for only four hours, and she can walk for only thirty minutes. (<u>Id.</u> at 158-59.) Her feet are sore and have to be soaked in salt water every day. (<u>Id.</u> at 159-60.) She has to shift positions when she sits to ease her back pain. (<u>Id.</u> at 160.) She sometimes becomes dizzy, usually when she straightens from a bent position. (<u>Id.</u> at 160-61.) The dizziness has caused her to fall in her back yard when she was picking up dog poop and in her basement when she was doing laundry. (<u>Id.</u> at 161-62.) She takes a nap every day at 1:00 in the afternoon. (<u>Id.</u> at 162.) She does not sleep well at night because of frequent trips to the bathroom. (<u>Id.</u>) At night she goes to the bathroom at least seven times and goes that amount also during the day. (<u>Id.</u>) She goes grocery shopping with her daughter, but has no close friends. (<u>Id.</u> at 163.) A lady from her church gave her a car, which she uses to go shopping or to church. (<u>Id.</u> at 166.) She plays the piano and sings at church every Sunday. (<u>Id.</u> at 163-64.) She also plays at rehearsal; all together, she plays three times a week. (<u>Id.</u> at 166.)

Plaintiff had lost approximately 60 pounds since being diagnosed with diabetes. (<u>Id.</u> at 165.) She walks for exercise every other day and drinks plenty of water. (<u>Id.</u> at 166.) She does not cook. (<u>Id.</u>) Her children help her with the cleaning. (<u>Id.</u>) She rakes leaves and sweeps "the front." (<u>Id.</u> at 167.) She smokes one-half pack of cigarettes a day. (<u>Id.</u>)

Her doctors have referred her to a psychologist or psychiatrist. (<u>Id.</u>) She has not gone because she would have to pay. (<u>Id.</u>) She has not gone to the People's Health Center because, after finding she received $400 monthly, they told her she was on a sliding scale and wanted her to pay $33 every time she saw someone. (<u>Id.</u> at 168.) She does not have the money. (<u>Id.</u>)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from various health care providers, and the report of a consultant.

In a Disability Report, Plaintiff stated that her illnesses first bothered her in 1997. (Id. at 63.) In a Work History Report, she stated that she had last worked in 2002 as a home health care worker, working four hours a day and five days a week. (Id. at 78.) She did not list a job working for the Jenkinses. (Id. at 72-79.)

On a separate questionnaire, Plaintiff reported that her medication made her drowsy. (Id. at 80.) Her vision was blurred, and she was tired and slept all the time. (Id.) Her symptoms became worse if she bent over, stood too long, or moved too fast. (Id.) Her diabetes prevented her from eating sugar and she had to be careful about her food portions. (Id. at 82.) She cannot read because of her blurred vision. (Id. at 83.)

Her medications include Atenol and Glipizide ER for diabetes and aspirin and Norvase for hypertension. (Id. at 88.)

Plaintiff's earnings records reflect earnings from 1967 through 1984, 1986, 1992 through 1996, 1998, 1999, 2000, and 2002. (Id. at 60.) Her highest annual earnings, $27,713.53, were in 1983. (Id.) Her annual earnings in 1996, 1998, 1999, 2000, and 2002, were $8,170.39, $951.95, $8,146.22, $635.00, and $1,171.39, respectively. (Id.)

The medical records before the ALJ begin with those of Plaintiff's annual physical exam at the People's Health Center ("the Center") in November 2000. (Id. at 129.) In June

2001, she had her flu shot.  (<u>Id.</u>)  Her hypertension was described as being "moderately controlled."  (<u>Id.</u>)  She had no other complaints.  (<u>Id.</u>)  She was encouraged to stop smoking.  (<u>Id.</u>)  She was to return in three months.  (<u>Id.</u>)

On January 18, 2002, Plaintiff requested a refill of her blood pressure medication, but explained that she did not have the funds to pay for it.  (<u>Id.</u> at 128.)  She had also been unable to afford the medication prescribed for her in the emergency room for bleeding caused by a heavy menstrual period.  (<u>Id.</u>)  She was told to take iron supplements and was given samples of a medication.  (<u>Id.</u>)  She did not appear for her next appointment.  (<u>Id.</u>)

On March 2, 2004, Plaintiff went to St. Mary's Health Center ("St. Mary's") with complaints of swelling on the right side of her face for the past three days.  (<u>Id.</u> at 94-119.)  The admission record notes that Plaintiff's medical history included diabetes for the past four to five years and hypertension.  (<u>Id.</u> at 96.)  She was not on any medication.  (<u>Id.</u>)  She had not been able to see any doctors, including a dental surgeon, because of her lack of finances.  (<u>Id.</u> at 96, 102.)  It was reported at one point in the record that she smoked one and one-half packs of cigarettes a day and at another point that she smoked two packs every day.  (<u>Id.</u> at 96, 105.)  She was alert and oriented to person, place, and time.  (<u>Id.</u> at 101, 104.)  On examination, she denied, inter alia, any dizziness or light-headedness, tingling or numbness, syncopal episodes, arthralgia (joint pain), or myalgia (muscular pain).  (<u>Id.</u> at 97.)  On admission, it was determined that she had a submandibular abscess, gingivitis, hyperglycemia, dehydration, hypertension, and diabetes mellitus, type 2.  (<u>Id.</u> at 98.)  She was started on sliding scale insulin, Glucovance for her diabetes, and Lisinopril for her hypertension.  (<u>Id.</u>)

An x-ray of her mandible revealed extensive periodontal disease. (<u>Id.</u> at 119.) It was noted that her knowledge of self-care was deficient. (<u>Id.</u> at 103.) She had no physical or emotional impediments to learning such. (<u>Id.</u> at 109.) Plaintiff was instructed on how to check her blood glucose levels and on the causes of hyperglycemia. (<u>Id.</u> at 107.) She was discharged two days later with medications and instructions on the use of a glucose meter.[4] (<u>Id.</u> at 110.) She was to follow-up at the Center on March 8. (<u>Id.</u> at 95.)

Plaintiff did, reporting to the examining physician at the Center that she had recently been hospitalized due to her low blood sugar and blood pressure. (<u>Id.</u> at 126.) She had been diagnosed with diabetes mellitus five years ago, but was not taking any medication for financial reasons. (<u>Id.</u>) She had an appointment with an oral surgeon. (<u>Id.</u>) She complained of a cough and occasional sleepiness. (<u>Id.</u>) She smoked one pack of cigarettes a day. (<u>Id.</u>) She was alert and oriented to person, place, and time and had a normal gait. (<u>Id.</u> at 127.) She was advised to obtain a reorder of her diabetes medication from St. Mary's. (<u>Id.</u>)

Plaintiff did not keep a March 28 appointment with a nutritionist. (<u>Id.</u> at 138.)

On April 19, Plaintiff reported to a health care provider at the Center that she had stopped coughing, but she did not have an appetite. (<u>Id.</u> at 122-24.) She complained of blurred vision, but had not checked her blood sugar levels for financial reasons. (<u>Id.</u> at 122.) Her hypertension was under control, although she had not been able to tolerate her medication

---

[4]It was noted in the Center's records that Plaintiff had failed to keep an appointment with a nutritionist on March 3. (<u>Id.</u> at 138.) She was hospitalized on that day.

due to the coughing.  (Id. at 124.)  On a "Problem List" generated that same day, "smoker" was listed.  (Id. at 135.)

Laila G. Gabrawy, M.D., reported in July that Plaintiff had 20/30 vision, without correction, in each eye.  (Id. at 130.)  With glasses, her vision was 20/20.  (Id.)  She smoked one pack of cigarettes a day.  (Id.)  She also had an immature cataract.  (Id. at 131.)  Dr. Gabrawy recommended glasses and an annual eye exam.  (Id.)

On August 31, Plaintiff was reportedly taking care of herself and watching her diet. (Id. at 139.)  Her diabetes and hypertension were both controlled.  (Id. at 140.)

Progress notes from the Center in 2004 indicate that Plaintiff was once told she needed to schedule an appointment when she telephoned for a medication refill and another time was told that her refill request was denied until she had scheduled a visit.  (Id. at 138.)  Her medications were refilled on August 2.  (Id.)

Plaintiff was described in April 2005 as being non-compliant.  (Id. at 135.)  It was also noted, when she came in on April 14 for a refill of her medications, that she had last been seen on August 31, 2004.  (Id. at 136.)  On examination, she was alert and oriented to person, place, and time.  (Id. at 137.)  Her gait was normal, and her mood and affect were within normal limits.  (Id.)  She did not have a depressed affect.  (Id.)  She was to return in three months.  (Id.)

In addition to the records of Plaintiff's health care providers, the ALJ had before him the report of a consultative examination by David Lipsitz, Ph.D., following a two-hour evaluation on September 21, 2005, performed at the request of her attorney.  (Id. at 142-46.)

Dr. Lipsitz noted that Plaintiff was missing some front teeth and "walked slowly with a rather unsteady gait." (Id. at 142.) She described to him her complaints: "'I have problems with my feet, I can't stand up on my feet and my legs ache, and my back, and I keep going to sleep all day and I stagger around, and I don't know why. I fell to the floor; I don't know what my imbalance is caused by.'" (Id.) She explained that she was no longer covered under Medicaid and could not get her medication. (Id.) Consequently, she was unable to function, she fell, and her feet hurt. (Id.) She further explained that she fell on the job five years before and was not allowed to return because her employers were worried she would fall again. (Id. at 142-43.) She also had high blood pressure, memory problems, and "some urinary incontinence." (Id. at 143.)

Because Plaintiff had worked hard, had her own business at one time, and had paid taxes, she was angered when she was denied food stamps. (Id.) People got on her nerves. (Id.) She was supposed to eat certain food for her diabetes, but could not afford it. (Id.) She had less energy, but "[h]er interest level [was] good." (Id.) She was on some medication, but forgot to bring it. (Id.) She had not used drugs or alcohol for 15 years. (Id.) She had been in special education classes when in school. (Id.) She was raped when ten years' old. (Id.)

Testing revealed the following:

> On the Wechsler Adult Intelligence Scale - III Kathleen obtained the following scores: Verbal IQ - 73, Performance IQ - 76 and Full Scale IQ - 72, placing his [sic] general level of intellectual functioning within the lower part of the "borderline" range. She also obtained the following index scores: Verbal Comprehension - 70, Perceptual Organization - 76, Working Memory - 86, and Processing Speed -81, reflecting a wide range of functioning from the lower part of the "borderline" to the middle of the "low average" range.

There was a wide and significant amount of variance among individual subtest scores suggesting specific intellectual strengths and weaknesses. Kathleen is unable to differentiate essential from nonessential details in her environment, and her vocabulary is poor. She is unable to adequately assimilate information from her environment, her knowledge of mathematical functions is poor, and she is unable to concentrate on a task at hand . . .

On the positive side, there are some strengths that suggest at least in some areas her functioning may approach the "average" range. She is able to take a systematic approach to problem-solving when she is motivated, and her short-term memory is intact.

(Id. at 144.)

Her mental status examination revealed "no evidence of any active psychotic functioning, no delusions, hallucinations, paranoid ideations, ideas of reference, or feelings of depersonalization." (Id. at 145.) "Her affect currently [was] flat and her mood appear[ed] to be depressed." (Id.) "Her thought processes [were] primarily preoccupied with her inability to function within society and deal with stress." (Id.) The diagnosis was major

depression, recurrent,[5] borderline intellectual functioning, diabetes and hypertension, and a

Global Assessment of Functioning of 45.[6]  (Id.)

Dr. Lipsitz opined that Plaintiff was in need of ongoing psychiatric treatment that

combined medication with psychotherapy.  (Id. at 146.)  In a Medical Source Statement

("MSS") he completed on behalf of Plaintiff, Dr. Lipsitz concluded that she had marked

limitations in one of four activities of daily living – the ability to cope with stress – and in

three of six activities requiring concentration, persistence or pace – the abilities to maintain

attention and concentration for extended periods, to perform at a consistent pace without an

unreasonable number and length of rest periods, and to sustain an ordinary routine without

special supervision.  (Id. at 147.)  She had moderate limitations in the remaining four activities

---

[5]Major depression, recurrent, is diagnosed when an individual has two or more major depressive episodes, each episode having five or more of the following symptoms present during the same two-week period: (1) a "depressed mood most of the day, nearly every day, as indicated by either subjective report (e.g., feels sad or empty) or observation made by others (e.g., appears tearful)"; (2) a "markedly diminished interest or pleasure in all, or almost all, activities most the day, nearly every day"; (3) "significant weight loss when not dieting"; (4) "insomnia or hypersomnia nearly every day"; (5) "psychomotor agitation or retardation nearly every day"; (6) "fatigue or loss of energy nearly every day"; (7) "feelings of worthlessness or excessive or inappropriate guilt . . . nearly every day"; (8) diminished ability to think or concentrate, or indecisiveness, nearly every day"; and (9) recurrent thoughts of death . . . recurrent suicidal ideation without a specific plan . . ."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders – Text Revision, 345, 356 (4th Text Rev. 2000) ("Diagnostic Manual").  The first or second symptom must be present.  Id. at 356.

[6]"According to the [Diagnostic Manual], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).  See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)).  A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic Manual at 34.

of the two categories. (Id.) She also had a substantial loss in her ability to respond appropriately to supervisors, co-workers, unusual work situations, and changes in a routine work setting. (Id.) Dr. Lipsitz opined that Plaintiff's limitations had lasted, or could be expected to last, at least twelve continuous months at the described severity. (Id.)

## The ALJ's Decision

The ALJ determined that Plaintiff had major depression, borderline intellectual functioning, and diabetes. (Id. at 15.) Her mental health impairments were severe, but were not of listing-level severity. (Id.) Her physical impairment was not severe on a twelve-month durational basis.[7] (Id.)

The ALJ next summarized Plaintiff's hearing testimony and the medical record, noting the reference in the records of St. Mary's that Plaintiff had no barriers to learning and the August 2004 reference to Plaintiff taking care of herself. (Id.) The ALJ also noted that Plaintiff had been diagnosed with diabetes for five years but had not taken her prescribed medication and had been told to stop smoking but had not. (Id. at 16.) Additionally, Dr. Gabrawy's records were inconsistent with the presence of a severe or disabling vision-related impairment or severe effects of diabetic retinopathy from March 2002 to September 2005. (Id.)

The ALJ then addressed Dr. Lipsitz's findings, concluding that the indication that Plaintiff "had adaptive functioning up to the middle of the low average range [of intellectual functioning] is a factor inconsistent with a severe or disabling condition of borderline

---

[7]See page 15, below.

intellectual functioning from March 31, 2002, to September 21, 2005." (Id.) After that date, when she was first diagnosed with depression, her description of her limitations was consistent with the record, including the limitations cited in the MSS.[8] (Id.)

The ALJ then concluded that after that date, Plaintiff could not return to her past relevant work and could not, according to the Medical-Vocational Guidelines, perform any jobs existing in significant numbers. (Id. at 17.) After that date, she was disabled within the meaning of the Act. (Id.)

She was not, however, disabled as of March 31, 2002, as she alleged. (Id.) Her activities were inconsistent with a severe or disabling mental or physical impairment from March 31, 2002, to September 21, 2005. (Id.) For instance, her ability to drive was inconsistent with her allegations of blurred vision and an inability to concentrate. (Id.) Her varied daily activities were indicative of mental and physical stamina, an ability to concentrate, and an ability to use her arms and legs. (Id.) She had not sought any mental health related treatment until September 2005 and her prior records did not indicate the presence of any severe or disabling psychiatric impairment satisfying the twelve-month durational requirement . (Id. at 17-18.)

---

[8]The ALJ also noted that assessments by consultants with the State of Missouri Section of Disability Determinations concluded that Plaintiff's "physical and/or mental capabilities" were greater than he had found. (Id. at 19.) He further noted that he was not bound by these findings and that the opinions of treating psychologists are commonly extended greater weight in disability determinations than those of the State agency consultants. (Id.) These assessments are not in the record. Because they clearly favored a finding of no disability and are irrelevant to Plaintiff's claims that the ALJ erred in not finding her disabled as of March 2002, the Court concludes that no remand in order to include them is necessary.

Although Plaintiff complained to Dr. Lipsitz of falling and foot-related problems, she told her doctors in 2004 that she did not have problems with syncope, or loss of consciousness, and did not have symptoms of numbness or tingling.[9] (Id. at 18.)  Her diabetes and hypertension could be controlled by medication; her vision problems were treatable with glasses.  (Id.)

The ALJ next considered the lack of any good cause for the instances when Plaintiff had failed to comply with medical directives, e.g., to stop smoking, to take medication, and to check her blood sugar levels, as detracting from her credibility.  (Id. at 19.)  Another negative consideration was Plaintiff's history of low earnings.  (Id.)  In seven of the fifteen years up to her alleged disability onset date, she had no earnings and in three years she earned annually less than $1,000.  (Id.)

Although not entitled to DIB, the ALJ referred the matter to "the component of the Social Security Administration responsible for authorizing Supplemental Security Income payments" for a determination of, if she was eligible, the amount and month for which payments would be made.  (Id. at 21.)  He cautioned that if she "fails to seek regular psychiatric help and follow the resulting treatment directives," she might be found to have experienced medical improvement and her benefits might be terminated.  (Id. at 21.)

### Legal Standards

---

[9]The ALJ also found that Plaintiff complained of joint pain.  The only reference the Court found to such was to the absence of any complaints when she went to St. Mary's.

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B) (alterations added).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step in the process the ALJ must determine whether the claimant has the RFC to return to her past relevant work, "review[ing] [the claimant's] residual functional capacity and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e) (alterations added). "Past relevant work" is "[w]ork the claimant has already been able to do" and has been "done within the last 15 years, lasted long enough for him or her to learn to do it, and was substantial gainful activity." 20 C.F.R. § 220.130(a) (alteration added). "[A]n ALJ must make explicit findings on the demands of the claimant's past relevant work." **Zeiler v. Barnhart**, 384 F.3d 932, 936 (8th Cir. 2004) (alteration added).

"[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy

v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).  Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added).  Some medical evidence must be included in the record to support an ALJ's RFC holding.  **Id.** at 867.  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"  **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions."  **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."  **Id.**  See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's

disability is inconsistent."). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

Additionally, the evaluation during the administrative review process of the severity of a mental impairment in adults must follow the technique set forth in 20 C.F.R. § 416.920a. This technique requires that the claimant's "pertinent symptoms, signs, and laboratory findings" be evaluated to determine whether the claimant has a medically determinable impairment. <u>Id.</u> § 416.920a(b)(1). The degree of functional limitation resulting from this impairment must then be rated. <u>Id.</u> §§ 416.920a(b)(2) and (c). This rating follows a specific format, identifying four broad functional areas and analyzing the degree of limitation in each area imposed by the mental impairment. <u>Id.</u> §§ 416.920a(c)(3) and (4). The degree of limitation in the first three areas is rated on a five-point scale: "[n]one, mild, moderate, marked, and extreme." <u>Id.</u> § 416.920a(c)(4). The degree of limitation in the fourth area, episodes of decompensation, is rated on a four-point scale: "[n]one, one or two, three, four or more." <u>Id.</u> A rating of "none" or "mild" in the first three categories and "none" in the fourth will generally result in a finding that the mental impairment at issue is not severe. <u>Id.</u> § 416.920a(d)(1). On the other hand, if the mental impairment is severe, the medical findings about that impairment and the resulting limitations in the four functional areas are to be compared "to the criteria for the appropriate listed mental disorder." <u>Id.</u> § 416.920a(d)(2). If the claimant has a severe mental impairment that does not meet or equal the severity of any

listing, then the claimant's residual functional capacity is to be assessed. Id. § 416.920a(d)(3). Section 416.920a(e) requires that the application of this technique be documented. An ALJ is to document the application in his or her decision. Id.

The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. See **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005); **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f). "If [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001) (alteration added). "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." **Id.** Accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006). If the

claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently." **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, the ALJ erroneously (a) assessed her disability onset date and

failed to consult a medical advisor to better ascertain that date and (b) assessed her credibility. The Court and the Commissioner disagree.

"In determining the date of onset of a disability, the ALJ should consider the claimant's alleged date of onset, [her] work history, and the medical and other evidence of [her] condition." **Karlix v. Barnhart**, 457 F.3d 742, 747 (8th Cir. 2006) (citing <u>Grebenick v. Chater</u>, 121 F.3d 1193, 1200 (8th Cir. 1997) and Social Security Ruling 83-20 (Social Security Administration 1983)) (alterations added). "'[T]he date alleged by the individual should be used if it is consistent with all the evidence available.'" **Id.** (quoting Social Security Ruling 83-20) (alteration in original). "If the medical evidence regarding onset is ambiguous, however, the ALJ should obtain an expert opinion from a medical advisor to determine a medically reasonable date of onset." **Id.** <u>See</u> <u>also</u> **Grebenick**, 121 F.3d at 1201 (noting that Social Security Ruling 83-20 requires the services of a medical advisor if the medical evidence of onset is ambiguous and there is no contemporaneous medical documentation). Additionally, "[a] title II worker cannot be found disabled under the Act unless insured status is also met at a time when the evidence established the presence of a disabling condition(s)." Soc.Sec.Rul. 83-20 (alteration added).

In the instant case, the medical evidence as to whether Plaintiff was disabled on or before June 2003 is not ambiguous. There are three medical records before that date. One is in November 2000 and is of an annual physical examination. That year Plaintiff earned $635.00. The next record is in June 2001 when Plaintiff had a flu shot. Other than her moderately-controlled hypertension, she had no complaints. She did not return in three

months as instructed.  She had no earnings that year.  In January 2002, she was given samples

or her blood pressure medication after explaining that she lacked the funds to pay for it.  She

did not keep her next appointment.  In the three months she worked in 2002, she earned more

money than in 2000.  She testified that she left her job in March 2002 because the woman she

cared for became "real sick" and did not like her.

Plaintiff did not testify that the depression she was diagnosed with the month before

the hearing had been present in 2002 or 2003 or 2004.  Nor is there any indication in her

medical records of its existence prior to that date.[10]  See e.g., **Karlix**, 457 F.3d at 747

(affirming ALJ's determination of alleged onset date when claimant alleged an onset date of

August 2001 but did not seek medical treatment for condition prior to April 2002 and record

was devoid of any other evidence suggesting an earlier date of onset).  Moreover, the question

is not whether she suffered from depression prior to the date it was diagnosed, September

2005, but is whether she was disabled prior to June 2003.  See **Grebenick**, 121 F.3d at 1200

(rejecting argument that ALJ improperly based decision as to disability onset date on date of

diagnosis rather than on date she became disabled; the ALJ properly sought to determine

whether claimant was disabled on or before date insured status ended).

---

[10]Plaintiff argues that diagnosis of recurrent major depression alone, see note 5, supra, suggests the presence of a mental impairment for a minimum of three months.  The question whether she suffered from depression since June 2005 does not, however, address the lack of any evidence that she did so prior to June 2003.  See e.g. **Gillette v. Barnhart**, 291 F.Supp.2d 1071, 1078 (D. N.D. 2003) (affirming ALJ's determination of onset date when, although claimant may have been disabled prior to that date, the record was conclusive as of that date).

It was Plaintiff's burden to establish her disability onset date. She failed to establish a date prior to September 2005.[11] See **McClanahan v. Comm'r of Social Security**, 474 F.3d 830, 837 (6th Cir. 2006) (noting that burden of proving disability onset date is claimant's).

Plaintiff also takes issue with the ALJ's adverse credibility findings. The Court notes that Plaintiff did not address in her testimony the question of how her impairments affected her 28 months earlier, as of June 2003, or 42 months earlier, as of March 2002.

Moreover, although the ALJ did not cite Polaski or the factors of Social Security Ruling 96-7 when assessing her credibility, he did employ those factors. For instance, he noted the lack of medical treatment and pain medication for conditions she alleged to be disabling.[12] See **Davis v. Apfel**, 239 F.3d 962, 967 (8th Cir. 2001) (credibility of claimant

---

[11]Plaintiff cites two cases in support of her argument to the contrary: **Arroyo v. Callahan**, 973 F.Supp. 397 (S.D. N.Y. 1997), and **Mason v. Apfel**, 2 F.Supp.2d 142 (D. Mass. 1998). In the former, the court held that "[a]n ALJ may not assume that a claimant developed a mental disorder on the date of SSA's consultative psychiatric examination, absent evidence to support such a conclusion." **Arroyo**, 973 F.Supp. at 399. In that case, there was testimony of medical and lay witnesses to support an earlier onset date, e.g., testimony that the claimant was fired five years before the alleged onset date after he went berserk; was earlier prescribed anti-anxiety and anti-depressant medication; had lived on the streets after being thrown out by his wife; and had earlier been diagnosed with recurrent depression, and testimony by a certified social worker who had provided psychotherapy to claimant months after the ALJ-determined disability onset date stating that she believed the claimant's condition had been disabling since 1987. **Id.** at 400. As noted above, in the instant case, there is no evidence to support the existence of a severe mental impairment prior to June 2003.

In **Mason**, 2 F.Supp.2d at 148, the onset date was considered ambiguous based on a counselor noting depression one month after the expiration of claimant's insured status, her treatment by a licensed social worker for one and one-half years after expiration, and testimony by a diagnosing psychiatrist that he considered her to have been disabled well before the expiration. Again, there is no comparable evidence in the instant case. Plaintiff's reliance on these cases is unavailing.

[12]Plaintiff did testify and also stated to some of her health care providers that she did not take her hypertension medication or check her blood sugar levels because of a lack of funds. Although a lack of funds for treatment may be relevant to a disability determination, see **Clark v. Shalala**, 28 F.3d 828, 831 n.4 (8th Cir. 1994), other than her own testimony, there is no evidence in the record that

was weakened by discrepancy between claimant's medical treatment history and subjective complaints, including lack of any prescription medication for alleged pain and lack of significant efforts to seek medical treatment to alleviate pain).  He also considered her poor work history as detracting from her credibility.  See **Comstock v. Chater**, 91 F.3d 1143, 1147 (8th Cir. 1996) (claimant's credibility weakened by work history characterized by low earnings and significant breaks in employment); **Siemers v. Shalala**, 47 F.3d 299, 301 (8th Cir. 1995) (subjective complaints of pain properly discounted where, inter alia, claimant had unimpressive work history).

## Conclusion

The question is not how this Court would decide whether Plaintiff is disabled within the meaning of the Act, but is whether the ALJ's decision that she was not disabled before September 21, 2005, is supported by substantial evidence on the record as a whole, including a consideration of the evidence that detracts from the ALJ's decision.  For the reasons discussed above, there is such evidence.  Accordingly,

---

Plaintiff attempted to obtain low cost medical treatment and was rejected or that she had been denied medical care because of her financial situation.  There is evidence that (i) when Plaintiff complained to a doctor about not being able to afford medications, samples were provided, (ii) she continued to smoke at least one pack of cigarettes a day, and (iii) she received Medicaid for a time, but was terminated for financial reasons, and that she was charged according to a sliding scale governed by income.  See **Riggins v. Apfel**, 177 F.3d 689, 693 (8th Cir. 1999) (rejecting claim of claimant that he could not afford medication; there was no evidence that he had sought treatment offered to indigents or that he stopped smoking in order to pay for medication); **Clark**, 28 F.3d at 831 n.4 (rejecting claim that claimant lacked financial resources to pursue more aggressive medical treatment; "claimant offered no testimony or other evidence" that she had been denied pain medication because of financial constraints); **Murphy v. Sullivan**, 953 F.2d 383, 386-87 (8th Cir. 1992) (similar holding).

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of July, 2007.